UNITED STATES DISTRICT COURT                                              C/M
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------- X
                                                             :
FELIPE R. RODRIGUEZ, JR.,                                    :
                                                             :  **MEMORANDUM**
                                  Plaintiff,                 :  **DECISION AND ORDER**
                                                             :
         - against -                                         :  17-cv-6040 (BMC)
                                                             :
COMMISSIONER OF SOCIAL SECURITY,                             :
                                                             :
                                  Defendant.                 :
----------------------------------------------------------- X

**COGAN**, District Judge.

1. Plaintiff *pro se* seeks review of the decision of the Commissioner of Social Security, following several hearings before an Administrative Law Judge, denying his applications for disability insurance benefits and supplemental security income. He is a former laborer (construction and moving work), presently 45 or 46 years old, but he was in his late 30s as of his original alleged onset date. Plaintiff has been trying to get benefits for a long time; his various applications filed in or before 2011-2012 were denied at the administrative level and did not result in hearings before an ALJ.

2. At the first hearing on this claim, there was some uncertainty as to plaintiff's alleged disability onset date. He originally claimed an onset date of September 16, 2011. However, when it emerged at that first hearing that he had worked as a mover after that date, he amended his alleged onset date, at the ALJ's suggestion, to July 1, 2013.

3. Plaintiff's primary impairments are herniated and bulging discs in his spine. He takes Motrin for his back pain and it appears he received spinal injections at one point. In opposing the Commissioner's motion before me, he states that he has had surgery on his back, but the record does not reflect that (plaintiff may be referring to the spinal injections he received

under sedation in February 2014). Indeed, a referral for an orthopedic consultation from plaintiff's treating physician who gave him the epidural injections, pain management specialist Dr. Samy Lasheen, found him, in essence, orthopedically normal and not a candidate for surgery. That was in March 2014, fairly late in his claims process (the ALJ's decision on review followed his final hearing on November 23, 2015).

4. I agree with the ALJ's decision that plaintiff was not disabled as of the amended alleged onset date of July 1, 2013, or even a later date consistent with Dr. Lasheen's opinion. Indeed, the record before – and for a year after – July 1, 2013 is very one-sided in support of the ALJ's finding, and has little probative value beyond supporting that conclusion.

5. A closer question, however, is presented by the fact that plaintiff was in an automobile accident on July 5, 2014, and the record after that date suggests that perhaps this date should be plaintiff's onset date. After the accident, there is a great deal more evidence that might suggest a sufficiently restrictive functional capacity to warrant a finding of disability. As the ALJ noted, "[t]he record establishes that the claimant had essentially normal clinical findings until mid-2014," but that "the claimant reported worsening symptoms and had positive findings after July 2014, when he was involved in a motor vehicle accident."

6. Before the accident, plaintiff had a few bulging discs, but after the accident, his MRI and EMGs showed four herniated discs, bulging discs, and pinched nerves in his cervical spine and two bulging discs in his lumbar spine, resulting in lumbar and cervical radiculopathy. Whether the post-accident degeneration of his spine was the result of the accident or just the natural course of his pre-existing condition really doesn't matter.

7. The difficulty with using the amended (but pre-accident) onset date to which plaintiff agreed at the second hearing, as opposed to the date of his accident, is that it distorts the

medical record. Plaintiff's post-accident treating providers appear as outliers if sandwiched between his pre-accident treating providers on the one hand, and the consulting examiner and medical expert on the other. But if we recognize that he was not disabled at least as of the accident date, and therefore substantially disregard the opinions of his pre-accident treating providers except as context, then his post-accident treating providers are more closely matched against the consulting examiner and the medical expert. The treating physician rule instructs courts to consider whether a treating physician's opinion is inconsistent with the entirety of the record; here, that inquiry may lead to a different result if the *relevant* part of the entire record is plaintiff's post-accident condition.

8. The most convenient place to start the inquiry of whether a post-accident perspective would have led to a different outcome is the reasons the ALJ gave for discounting the opinions of plaintiff's post-accident treating providers. First, plaintiff saw a board-certified neurologist, Dr. Igor Stiler, after the accident, but neither Dr. Stiler's treatment notes nor his RFC questionnaire were received by the ALJ until after the hearing. The ALJ nevertheless took Dr. Stiler's treatment into account when rendering her decision. Dr. Stiler treated plaintiff between July 2, 2015 (three days short of one year after the accident) and September 25, 2015. The timing of the appointments is peculiar (more on this below) – accepted at face value, it would appear by the signature on the records that plaintiff saw Dr. Stiler at least once every six days, usually every two to four days, and sometimes every day.

9. There is no doubt that if Dr. Stiler's RFC questionnaire controls, then plaintiff is disabled, as Dr. Stiler opined that plaintiff cannot sit, stand or walk for even an hour a day without constantly changing position, and that plaintiff would need unscheduled breaks and would be absent for more than three times a month. But the ALJ found that Dr. Stiler's opinion

was not entitled to "controlling or even significant weight," and limited it "to the extent of accepting that the claimant is restricted to work at the sedentary level of exertion and requires the ability to alternate sit and stand positions at will." That seems to be the ALJ's way of stating that Dr. Stiler's opinion has little to no probative value. There are a number of reasons apparent from the record, some of which were set forth by the ALJ, which support the ALJ's conclusion to limit the weight of Dr. Stiler's opinion.

10. The main problem that the ALJ mentioned was that the severely restrictive RFC that Dr. Stiler found was not consistent with his treatment notes. Every treatment note said that plaintiff's prognosis was "good," even though plaintiff continually reported no improvement, and that plaintiff was able to engage in "light exercise," which seems somewhat inconsistent with other parts of the notes that say that plaintiff could not "walk as usual" (and inconsistent with plaintiff's testimony at the hearing that he couldn't walk for more than ten to fifteen minutes at a time). In addition, the ALJ noted that Dr. Stiler's treatment notes did not mention sensory, strength, and reflex deficits severe enough to warrant the restrictive conclusion he reached.

11. These are good reasons for the ALJ to have limited the weight of Dr. Stiler's opinion. She may also have been suggesting, although she did not come right out and say it (I do not know why ALJs scrupulously avoid frankness on these issues), that either plaintiff's subjective reporting to Dr. Stiler or Dr. Stiler's opinion were not credible. First, the ALJ stated: "Notably, Dr. Stiler indicated that all of the assessed limitations have been present since July 1, 2012, a full year before the amended alleged onset date, and two years before the 2014 motor vehicle accident." This "notable" observation by the ALJ could only be interpreted as implying that Dr. Stiler was stretching his conclusions to get to an onset date sufficient to support

plaintiff's claim, which seems very likely considering that the pre-accident record clearly did not support Dr. Stiler's conclusion.

12. Second, the ALJ noted that although plaintiff testified that he needed a cane to walk, Dr. Stiler's notes contained no such restriction.

13. Third, the ALJ mentioned that the fact plaintiff was only taking Motrin, and that this was inconsistent with Dr. Stiler's finding of functionally incapacitating pain.

14. Fourth, the ALJ noted that "Dr. Stiler did not begin treating the claimant until July 2015." Although the ALJ did not expressly state why this is significant, what the ALJ may have been suggesting – and if not, I think it would have been a valid concern – is that plaintiff had two months of treatment with Dr. Stiler after his disability application had been pending for years – and, indeed, after plaintiff's first hearing before the ALJ on this application. Plaintiff may have obtained this treatment because he needed it physically, or because he needed it to enhance his pending disability claim, or both.

15. I see nothing wrong with an ALJ being a bit skeptical when a claimant begins treatment with a brand new provider at such an opportune time, especially when the claimant was represented by one of the leading disability law firms, as is the case here.[1] (It is again surprising that ALJs never seem to ask the source of a claimant's referral to a particular provider, since the source could be at least arguably probative of credibility).

16. Fifth, although the ALJ did not note this, it is not clear from the record how many times, if at all, Dr. Stiler actually examined plaintiff. I have never heard of a neurologist who sees a patient every day or third day or week over a three-month period unless the patient is in

---

[1] Plaintiff was represented by counsel during the administrative proceedings, but is now *pro se* in this review proceeding.

5

the hospital, which plaintiff was not. The answer may be found in the fact that Dr. Stiler's digital signature is not the only one on each treatment note. The first name to appear is that of a physical therapist, and each note is entitled "Progress Report." Each note also contains a carried-over section entitled "Physical Therapy Assessment." It seems that each note may reflect a physical-therapy session and not a new neurological examination or consultation. If so, the notes do not have the authoritative weight of a treating physician's conclusions, and the RFC evaluation that Dr. Stiler submitted may reflect the same amount of physical examination that a consulting physician would perform – perhaps one session to evaluate, diagnose, and recommend treatment.

17. There is also a report of a one-time examination by a board-certified physiatrist, Dr. Christopher Kyriakides, who performed an EMG on plaintiff and confirmed plaintiff's lumbar radiculopathy about a month after the accident. He also confirmed the derangement of plaintiff's spine, partial ACL and full meniscus tears in plaintiff's left knee, and positive motion tests. Dr. Kyriakides concluded that plaintiff "is currently totally disabled and will be reassessed in 2 weeks." (He was apparently not reassessed, at least not by that physician.).

18. The ALJ seized upon the improper finding of "totally disabled" as "too conclusory to merit any weight." Of course that is true, but it is not an adequate ground to dismiss outright Dr. Kyriakides's entire evaluation, as the ALJ appears to have done, because she did not comment on it further. First, that evaluation may be important because it is based on an examination shortly after plaintiff's accident. Second, as the predicate for that opinion, Dr. Kyriakides found, based on MRIs and EMGs, that plaintiff's status post-accident was "cervical lumbosacral trauma with internal derangement and multiple cervical herniations, multiple lumbosacral bulges with thecal sac impingement, [and] torn meniscus of the left knee with

partial ACL tear." There is no dispute about this post-accident diagnosis, and more importantly, it is fully consistent with plaintiff's self-reporting of limited functionality after his accident. So although Dr. Kyriakides' opinion of "totally disabled" is not entitled to any weight, the evidence upon which it was based supports a permissible conclusion – that plaintiff has severe functional limitations – and that is worth considering.

19. The starkest post-accident conflict in the medical record is between the opinion of Dr. Anson Moise, a pain-management physician (and his Registered Nurse employee), who did an initial evaluation of plaintiff, and the opinion of Dr. Vinod Thrukral, an internist who performed a consultative examination of plaintiff three weeks later. Both of these opinions suffer from the limitation on reliability of any single-examination diagnosis, but Dr. Moise's specialty at least seems more relevant to plaintiff's impairment.

20. The ALJ noted that Dr. Moise's examination showed "multiple positive findings on examination, including reduced range of motion of the cervical and lumber spine, positive Spurling sign, positive straight leg raising, positive Faber's to the right, slightly decreased motor strength, decreased sensation in the right upper and lower extremities, and a slow antalgic gait." But aside from noting this, we do not know what, if any, meaning the ALJ ascribed to Dr. Moise's findings, as she never mentioned them again.

21. Instead, the ALJ preferred Dr. Thukral's examination, giving it "some" weight. Dr. Thukral effectively found that there was nothing wrong with plaintiff except some tenderness in his back and knee, and that he was therefore able to do light work. The ALJ gave Dr. Thukral's opinion only "some" weight because he had not evaluated plaintiff's EMG and MRI studies.

22.     The ALJ gave "substantial" weight to only one post-accident opinion. This was the opinion of Dr. Arthur Brovender, an orthopedist, the medical expert who had never examined plaintiff (as is the practice in these administrative hearings with respect to medical experts) but who testified at the hearing that plaintiff was capable of doing medium-level work. The ALJ reduced that assessment to sedentary work because Dr. Brovender did not review Dr. Stiler's notes and RFC evaluation (as explained above, those were submitted after the hearing).

23.     The ALJ's methodology in evaluating Dr. Thukral's and Dr. Brovender's opinions is inconsistent with the substantial evidence standard. She correctly recognized the limitations in each, but then arbitrarily discounted both. The result is a residual functional capacity that is inconsistent with all of the medical opinions in the record without a clear reason for that outcome.

24.     As noted above, Dr. Thukral's opinion that plaintiff can do light work suffers not only from the limitation of a single examination, but also from the fact that Dr. Thukral is an internist and plaintiff's impairments are orthopedic and neurological. More importantly, as the ALJ recognized, Dr. Thukral did not review the MRIs or EMGs – important, perhaps the most important, objective evidence. But the remedy for that, especially the last fact, is not to say, "well, Dr. Thukral hadn't seen the EMGs or MRIs, so we'll knock his opinion down from light work to sedentary work." Nothing supports doing that. The real question is why should the ALJ give any weight at all to the opinion of a consultant physician without the relevant specialty who has not even seen the objective medical tests for the patient's condition?

25.     The ALJ's inadequate treatment of Dr. Brovender's opinion, which effectively controlled the outcome of this case, is subtler but just as pronounced. First, it does not make sense that the ALJ would discount his opinion from medium work to sedentary work because Dr.

8

Brovender had not seen Dr. Stiler's treatment notes. As noted above, and as the ALJ recognized, Dr. Stiler's opinion was unreliable in some ways, so it does not follow that Dr. Brovender's unfamiliarity with it is necessarily material. If the ALJ is giving it little weight, there is no reason to think that Dr. Brovender would give it any more.

26. The ALJ's conclusion about how to reconcile Dr. Brovender's opinion with Dr. Stiler's is particularly confusing because she did not identify any of Dr. Stiler's opinions about plaintiff's functional limitations that were supported by his clinical findings and other evidence. Instead, as described above, the ALJ upgraded Dr. Stiler's final *conclusion* about plaintiff's ability to work and accepted Dr. Stiler's opinion to the extent that it comported with that conclusion (that plaintiff could do, but was restricted to, sedentary work). If the ALJ thought that Dr. Stiler's opinion was material, she should have explained how the material parts justified downgrading Dr. Brovender's contrary findings.

27. More importantly, Dr. Brovender's conclusions leave many questions unanswered. The ALJ's reliance on those conclusions ignored a rather effective cross-examination. Cross-examination brought out that Dr. Brovender retired from private practice nearly 20 years ago. Since that time, he has made a living solely by testifying as a medical expert in Social Security Administration cases – over 100 per year. Just as I suggested above that a claimant's post-hearing retention of a new "treating" physician, especially one referred by the claimant's lawyer, might be a factor affecting the physician's credibility, this physician's occupational reliance on the Administration might also raise a credibility issue. This is not to suggest any conscious dissembling by the witness; it is routine to instruct juries to take into account that experts are being paid, and the amount of payment and the expert's relationship with the parties is a factor. I do not see it differently in this context.

28. Moreover, cross-examination highlighted the many positive findings about plaintiff's condition in the record and Dr. Brovender, despite being quite combative, was forced to acknowledge them. He testified on direct examination that plaintiff's condition was "essentially normal." On cross-examination, however, Dr. Brovender admitted that there was a lot about plaintiff's condition that was not normal. He had acknowledged the presence of many of these facts during his direct testimony. But the ALJ never asked him how these conditions played into plaintiff's RFC. I read his entire examination to say (I paraphrase): "plaintiff can do medium work. He had a bunch of tests that show impairment. But I do not care about those tests, I still think he can do medium work." A conclusion is not an opinion. Dr. Brovender's testimony merely stated a conclusion and thus added little to the substantial evidence analysis. There was very little inquiry into "why" Dr. Brovender weighted some evidence and discounted other evidence, leaving only a rather unconvincing conclusion.

29. Because of the weaknesses in the consulting and medical-expert testimony, and the distortion of the record occasioned by the early (even as amended) onset date, there is no substantial evidence to support the ALJ's conclusion. It appears that the ALJ tried to navigate a middle ground between all of the medical opinions, but the result is that her conclusion is supported by none of them. An ALJ's conclusion may be supported by substantial evidence even if that evidence is solely non-medical. See Titles II & XVI: Giving Controlling Weight to Treating Source Med. Opinions, SSR 96-2P (S.S.A. July 2, 1996). But here, the ALJ did accept the medical evidence (to varying degrees), yet did not explain which findings about plaintiff's functional limitations she accepted from each physician or why, so the Court cannot conclude that her opinion is supported by substantial evidence.

30. It may be that on remand, plaintiff's case fails simply because the evidence in favor of a highly restrictive RFC is just as flawed as the evidence opposed to it, and therefore plaintiff cannot meet his burden of proof. The absence of substantial evidence of disability can be substantial evidence of non-disability, but that is not what the ALJ found. If the reason plaintiff loses is because the evidence in favor of finding disability does not outweigh the evidence opposed to it, then the ALJ should so state. However, she should not enhance the inadequate evidence opposing a disability finding and diminish the evidence in favor of one to end up with a conclusion that is not supported by any of the evidence.

31. The Commissioner's motion for judgment on the pleadings is denied and the case is remanded for a new hearing. At that hearing, the ALJ is directed to: (1) use a second amended onset date of July 5, 2014; and (2) obtain an evaluation by a consulting orthopedist who examines plaintiff and reviews all of his orthopedic records. The Clerk is directed to enter judgment accordingly.

**SO ORDERED.**

_____
U.S.D.J.

Dated: Brooklyn, New York
June 22, 2018